UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LAKESHA NORINGTON          )
                           )
            Plaintiff,     )
                           )     CAUSE NO. 3:11-CV-282 RM
      vs.                  )
                           )
DR. MICHAEL MITCHEFF,      )
                           )
            Defendant.     )

<u>OPINION AND ORDER</u>

Lakesha Norington, also known as Shawntrell Marcel Norington, a *pro se* prisoner,[1] is proceeding on a claim that she is being denied adequate medical care for gender identity disorder ("GID") in violation of the Eighth Amendment. (DE 16.) The defendant, Dr. Michael Mitcheff, moves for summary judgment in his favor. (DE 70.) For the reasons stated below, the court grants the motion.

I. LEGAL STANDARDS

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute

---

[1] The plaintiff was born a male but identifies herself as a female. Because she refers to herself with female pronouns, the court does so here out of courtesy. For the sake of accuracy the court hasn't changed any of the pronouns included in Ms. Norington's medical records.

between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. To decide whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion can't rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party doesn't establish the existence of an essential element on which she bears the burden of proof at trial, summary judgment is proper. Massey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006).

Under the Eighth Amendment, inmates are entitled to adequate medical care. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjecting component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Greeno v. Daley, 414 F.3d 645,

653 (7th Cir. 2005). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005) (internal citation omitted).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Jackson v. Kotter, 541 F.3d 688, 697 (7th Cir. 2008). A mere disagreement with medical professionals doesn't establish deliberate indifference, nor does negligence or even medical practice, since "the Eighth Amendment does not codify common law torts." Arnett v. Webster, 658 F.3d 742, 751 (7th Cir. 2011). Prisoners aren't entitled to demand specific care, nor are they entitled to the "best care possible." Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997). When an inmate has received some form of treatment for a medical condition, to establish deliberate indifference he must show that the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." Arnett v. Webster, 658 F.3d at 751.

GID, also known as gender dysphoria or transsexualism, is a condition in which a person "experiences discomfort or discontent about nature's choice of his or her particular sex and prefers to be the other sex." Meriweather v. Faulkner, 821 F.2d 408, 411-412 (7th Cir. 1987) (internal citation omitted). It is recognized as psychiatric disorder by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, and constitutes a serious medical need for purposes of the Eighth Amendment. Fields v. Smith, 653 F.3d 550, 553 (7th Cir. 2011); Meriweather v. Faulkner, 821 F.2d at 413. However, "the diagnosis is appropriate only if the discomfort has been continuous for at least two years, and is not due to another mental disorder[.]" Meriweather v, Faulkner, 821 F.3d at 412 (internal citation omitted). Among persons with GID, the feelings of dysphoria will "vary in intensity." Fields v. Smith, 653 F.3d at 553. Some individuals are able to manage the discomfort and function appropriately, whereas others might experience anxiety or depression, or might even try to commit suicide or mutilate their own genitals. Id.

The accepted standard of care for GID dictates a "gradual" approach to treatment, beginning with "psychotherapy and real life experience living as the opposite gender." Fields v, Smith, 653 F.3d at 553-54. For a number of individuals with GID, this treatment will be effective in controlling feelings of dysphoria. Id. Treatment such as hormone therapy might be necessary for others with a more severe form of the disorder. Id. In the most severe cases, sexual reassignment surgery may be needed. Id. Inmates with GID are entitled to treatment, but not

necessarily to a specific form of treatment, particularly those that are "esoteric" or "protracted and expensive" and so "beyond the reach of a person of average wealth." <u>Maggert v. Hanks</u>, 131 F.3d 670, 671-672 (7th Cir. 1997). As our court of appeals recognized, an inmate is entitled to adequate medical care, but not to "care that is as good as he would receive if he were a free person, let alone an affluent free person." <u>Id.</u> at 671. By the same token, a state can't simply "outlaw" hormone therapy and other effective treatments for GID, since such a policy serves no legitimate penological purpose. <u>Fields</u>, 653 F.3d at 556-557.

## II. FACTS

In her response to the summary judgment motion, Ms. Norington relies on medical records and other exhibits she attached to two earlier versions of her complaint. (*See* DE 74-2 at 1, DE 74-3 at 1.) The court struck those pleadings due to various deficiencies, although there was nothing improper about the exhibits themselves. (*See* DE 4, 9; *see also* DE 1-1, DE 7-5 to 7-19.) As a *pro se* litigant, Ms. Norington might not have realized that she should have submitted the exhibits along with her amended complaint if she wanted them considered. *See* <u>French v. Wachovia Bank</u>, 574 F.3d 830, 835 (7th Cir. 2009) (later filed complaint supersedes all earlier pleadings and "controls the case from that point forward."). Ms. Norington is indigent and may not have had funds to pay for another copy of these voluminous documents. In the interest of justice, the court will consider

these documents in connection with the motion for summary judgment, and will direct the clerk to unseal them so they are once again part of the public record.

Ms. Norington has been incarcerated within the Indiana Department of Correction ("DOC") since 2004.[2] *See* <u>Norington v. State</u>, No. 49A04-0702-CR-112 (Ind. Ct. App. Sept. 10, 2007). She is incarcerated in the disciplinary segregation unit of the Westville Correctional Facility, and is under the regular care of medical staff for asthma and Human Immunodeficiency Virus ("HIV"). (DE 14; DE 73-2, Mitcheff Aff. ¶¶ 7-8.) Ms. Norington was housed at several different correctional facilities before this, including Pendleton Correctional Facility, Indiana State Prison, and Wabash Valley Correctional Facility. (DE 73-2, Mitcheff Aff. ¶ 7.)

Dr. Mitcheff is a physician who has been licensed to practice in Indiana since 1987. (DE 73-2, Mitcheff Aff. ¶ 2.) He is the Regional Medical Director for Correctional Medical Services ("CMS"), now called Corizon, and has been in this position since 2006. Corizon contracts with DOC to provide medical care to Indiana prisoners. (<u>Id.</u> ¶ 3.) As Regional Medical Director, Dr. Mitcheff hires physicians, reviews prescriptions for non-formulary medications, reviews referrals for outside treatment, and makes treatment suggestions to treating physicians. (<u>Id.</u> ¶ 5.)

In January 2007, Ms. Norington was housed at Pendleton and was seen by prison psychologist Dr. Todd Chilton after complaining about "stress" related to

---

[2] In 2004, Ms. Norington pleaded guilty to robbery, burglary, and voluntary manslaughter, and was sentenced to an aggregate term of 60 years in prison. <u>Norington v. State</u>, No. 49A04-0702-CR-112 (Ind. Ct. App. Sept. 10, 2007).

being a "transgendered person." (DE 7-6 at 2.) The doctor noted that Ms. Norington didn't appear to be under any kind of acute distress but expressed frustration about disrespectful treatment by DOC staff. (Id.) Dr. Chilton saw Ms. Norington again in September 2007, and she requested a psychological assessment to "determine his diagnosis vis a vis potential gender identity disorder." (DE 7-7 at 14.) The doctor noted, "He claimed to be very upset about the situation but appeared completely euthymic,[3] [and] seemed to enjoy talking about himself as being different from others." (Id.)

After being transferred to Westville, Ms. Norington saw prison psychiatrist Evert Vanderstoep in December 2007. (DE 7-8 at 2.) The doctor noted that Ms. Norington "wants psychiatric clearance for rx of gender disorder" and concluded that she was "without evidence of any serious mental [disorder]." (Id.) Dr. Vanderstoep later made a note in Ms. Norington's chart questioning whether hormone treatment might be incompatible with her HIV medications. (DE 7-9 at 32.)

On August 20, 2008, Ms. Norington saw Dr. Thomas Allen, a psychologist at Westville. (DE 7-9 at 29.) The doctor noted that Ms. Norington wanted "to begin therapy for transgender issues." (Id.) Dr. Allen met with Ms. Norington eight days later "for the first therapy session for transgender issues." (DE 7-10 at 5.) Dr. Allen noted that other goals of therapy included helping Ms. Norington develop

---

[3] Euthymic is defined as "joyful" or experiencing "mental peace and tranquility." STEADMAN'S MEDICAL DICTIONARY at 678 (28th ed.).

problem-solving and coping strategies to curb her "explosive aggressive outbursts" that were "disproportionate to precipitating event[s]." (Id. at 6-7.) They met again for therapy twice more in September 2008,[4] and discussed transgender issues. (Id. at 12-17.)

Dr. Allen met with Ms. Norington for another therapy session on September 25, 2008, but Ms. Norington was "not focused" on therapy that day and instead wanted to "debate" her request to transfer to a different facility. (DE 7-10 at 22.) The doctor noted that Ms. Norington "became more frustrated as the conversation continued and he wasn't getting his way." (Id.) Dr. Allen saw her again on October 10, 2008, and October 17, 2008, and felt that Ms. Norington was more "engaged" in therapy on those dates. (Id. at 30.) He noted that Ms. Norington reported she was doing "okay" and agreed to work on her own to change some of her behaviors. (Id.) Dr. Allen saw Ms. Norington again on October 25, 2008, and they discussed "his behaviors and reactions to the triggers and how this interferes with his goals for communication." (DE 7-11 at 2.) They also discussed her frustration with custody officers calling her "Mr." and "Sir," which she felt was disrespectful. (Id.)

Dr. Allen saw Ms. Norington again on November 7, 2008, and she continued to express frustration over perceived mistreatment by custody staff. (Id. at 9-10.) She also expressed displeasure that Dr. Allen was "taking custody's side" and not

---

[4] Throughout this period, Ms. Norington also received behavioral health monitoring by mental health staff since she was housed in long-term segregation. (*See* DE 7-11 at 6-7; DE 7-12 at 20; DE 7-13 at 17, 23.) No specific mental health issues were noted in the records of those visits.

listening to her. (Id.) She saw Dr. Allen again on November 25, 2008, and complained about a pending disciplinary charge, telling the doctor she wanted a transfer to another facility. (DE 7-11 at 13.) Dr. Allen noted that Ms. Norington didn't want to talk about transgender issues that day. (Id.)

Dr. Allen saw Ms. Norington again in February 2009, and reported that she was "stable" and "functioning well."(Id. at 26.) Ms. Norington reported no concerns to the doctor other than wanting to know when she would start hormone therapy. (Id.) The following month, Ms. Norington put in a health care request directed to Dr. Allen stating, "I need to know how much longer will you tell me lies?" (DE 7-12 at 5.) Dr. Allen responded that he tried to see Ms. Norington that day but couldn't get on the segregation unit. (Id.) On March 19, 2009, Dr. Tommy Glasgow, another prison psychologist saw Ms. Norington. (Id. at 26.) Dr. Glasgow noted that Ms. Norington was "agitated" and wanted to know when she would be receiving hormone therapy and a sex change. (Id.)

Ms. Norington was transferred back to Pendleton, and was seen by Dr. Chilton in May 2009 after requesting hormone therapy. (Id. at 33.) Dr. Chilton told her he had "contacted CMS medical and psychiatric staff" and that she was "unlikely to be approved" for this treatment. (Id.) The doctor told her he could provide her with counseling for gender issues if she wished. (Id.)

Dr. Chilton saw Ms. Norington on October 13, 2009, after a suicide note was found in her cell. (Id. at 19.) Dr. Chilton's notes reflect that Ms. Norington said she wasn't planning to commit suicide and instead had written the note because she

was angry about not receiving estrogen therapy. (Id.) The doctor noted that Ms. Norington said she "was not suicidal, never has been suicidal, and cannot ever see himself committing suicide." (Id.) The doctor further noted that "[a]lthough he was angry today, he did not appear depressed or in psychological pain." (Id.)

Dr. Chilton reviewed Ms. Norington's chart in January 2010 due to her placement in disciplinary segregation, and noted that she had given inconsistent statements to staff about whether she had ever tried to commit suicide. (DE 73-3 at 9.) Dr. Chilton noted Ms. Norington told a nurse in January 2010 that she attempted suicide 20 times during her lifetime with the last attempt in 2005, whereas she told the doctor in October 2009 that she had never attempted suicide. (Id.) Dr. Chilton deemed Ms. Norington's reports to staff about her personal history "unreliable." (Id.) On January 19, 2010, Ms. Norington was seen in her cell by mental health staff but refused to talk. (Id. at 10.) She was seen again in February 2010 and March 2010 for behavioral health monitoring, and no immediate problems or issues were noted. (Id. at 11-12.)

Ms. Norington made several more written requests for estrogen therapy throughout this period. (DE 73-3 at 1-4, 13-18.) In response to one of these requests she was told: "This has been addressed with/by the Regional Medical Director many times and has been denied." (Id. at 1.) Similarly, in April 2010, she was told: "This request for estrogen was denied by CMS director and DOC in the past. This medication will not be provided." (Id. at 13.) On April 17, 2010, she asked to speak with a "transgender mental health specialist." (Id. at 16.) She was

told that there was no such person on staff but if she wanted to speak with a therapist to let them know. (Id.) On April 26, 2010, she asked for "mental health assistance" related to GID. (Id. at 18.) Dr. Chilton responded that he would "follow up today." (Id.) The doctor's notes reflect that he went to Ms. Norington's cell later that day and tried to interview her, but Ms. Norington stated she "had nothing to say." (Id. at 21.) Dr. Chilton went to speak with her again the following day, and reported that she was calm and willing to talk. (Id.) Ms. Norington's only concern was that she had been put on a nutraloaf diet for disciplinary reasons, which she didn't feel was compatible with her medically prescribed diet. (Id.) Dr. Chilton agreed to follow up on that issue. (Id.) The doctor's notes reflect a clinical assessment of GID, Antisocial Personality Disorder, and Narcissistic Personality Disorder. (Id. at 23.)

Ms. Norington was transferred to Wabash Valley, and on May 28, 2010, prison psychologist Dr. Mary Sims saw her; the doctor reported Ms. Norington had "stopped me on the range and said that he was concerned about starting his estrogen treatment." (DE 73-4 at 9.) The doctor referred her to the prison psychiatrist as the first step in seeking hormone therapy. (Id. at 9-12.) Dr. Sims saw Ms. Norington again on June 4, 2010, for counseling after she reported being "stressed." (Id. at 12-13.)

On June 7, 2010, Ms. Norington met with Dr. Brion Bertsch, the prison psychiatrist. (DE 73-4 at 15.) Dr. Bertsch noted that Ms. Norington hadn't sought estrogen therapy or psychiatric care for gender issues before her incarceration,

which Ms. Norington attributed to not wanting her family to know about her condition. (Id.) The doctor's notes reflect that Ms. Norington said she wanted estrogen therapy in part because she would "enjoy all the attention" it would provide.[5] (Id.) Dr. Bertsch also noted that Ms. Norington previously had been denied estrogen treatment and concluded, "[A]fter just this one assessment I do not see an indication to reapply." (Id. at 16.) He also saw no need to prescribe psychotropic medications, but recommended that Ms. Norington pursue counseling to help her develop better problem-solving and coping skills. (Id.) Dr. Bertsch noted that he would "continue to follow" the situation. (Id.) His notes reflect a clinical diagnosis of GID, as well as Narcissistic Personality Disorder. (Id. at 15.)

Ms. Norington was transferred to ISP on June 14, 2010.[6] (DE 73-4 at 19.) Upon her arrival, she reported wanting to speak with mental health staff about gender issues. (Id. at 20.) A nurse saw her, and Ms. Norington reported that she had begun hormone treatment at a prior prison, although the nurse saw no documentation of this in her chart. (Id. at 23.) Dr. Reinaldo Matias reviewed Ms. Norington's chart on August 3, 2010. (Id. at 29.) Dr. Matias has a doctoral degree in psychology and has been a licensed psychologist since 1996. (DE 73-8, Matias Aff. ¶ 2.) He is the lead psychologist at ISP and has been in that position since

---

[5] In her memorandum Ms. Norington disputes telling Dr. Bertsch that the "only reason" she wanted a sex change was because of all the attention it would provide. (DE 74-1 at 2.)

[6] Documents in the record reflect that Ms. Norington requested the transfer for "visitational purposes." (DE 73-13 at 28-29.)

June 2007. (Id.) Dr. Matias noted that Ms. Norington had been transferred from Wabash Valley "with long term segregation time to serve." (DE 73-4 at 29.) He also noted that Ms. Norington had an active diagnosis of GID. (Id.)

After meeting with Ms. Norington on August 11, 2010, Dr. Matias ,ade the following comments:

> Norington comes in wanting support as he negotiates his transgender status within IDOC. He is clear that his goal is to have hormonal treatment and ultimately sex-reassignment surgery. He reviewed some of the struggles he has had at other facilities with transgender issues. I reviewed these issues with him, as well as reviewed his conduct, which has been terrible, and resulted in his now having disciplinary segregation time to serve until December of 2012. The initial goal will be to help him settle into his environment and avoid further conduct reports.

(DE 73-4 at 30.) After seeing Ms. Norington again on August 18, 2010, Dr. Matias made the following comments:

> Norington comes in focusing on transgender issues. She maintains a commitment to live as a woman within the IDOC. We reviewed some of the challenges she will face and has faced to date. She is clear that this will be a long and challenging process but thus far is committed to her goals. I reviewed with her issues related to her interactions with other inmates and with how she is managing her HIV status.

(DE 73-5 at 3.) Dr. Matias's clinical assessment was that Ms. Norington had GID and Narcissistic Personality Disorder.[7] (Id. at 1.) His treatment plan was "to include transgender issues as a focus of our sessions." (Id. at 4.)

---

[7] Dr. Matias later removed the Narcissistic Personality Disorder diagnosis, concluding that Ms. Norington did not meet all the criteria for that disorder, and still later added Antisocial Personality Disorder as an active diagnosis. (*See* DE 73-5 at 3, 30.)

Dr. Matias saw Ms. Norington again on August 30, 2010, and noted that she "provides a credible history of having always felt like a biological female, but not having the knowledge or means to transition earlier in his life." (Id. at 9-10.) On September 1, 2010, Ms. Norington put in a medical request for estrogen therapy and "testosterone blockers." (DE 73-5 at 11.) Dr. Gerald Myers, a prison physician, responded: "Per RMD Dr. Mitcheff's directive, evaluation per behavioral health staff is warranted to obtain additional information." (Id. at 11.) Dr. Matias saw Ms. Norington again that same day, (Id. at 12-13.) and reported as follows:

> Norington and I reviewed her history and conduct problems. We reviewed her thoughts and feelings about murdering her victim. She clearly has no remorse over the incident, and feels unfairly persecuted by the court. We reviewed anger management issues, especially as it relates to custody staff. She continues to want to make the transition from male to female. She has been focused on her appearance and trying to feminize herself as much as she possibly can.

(DE 73-5 at 13.)

Dr. Matias saw Ms. Norington again on September 8, 2010, and noted that she had a "pending conduct report for disorderly conduct." (Id. at 15-16.) They discussed the importance of Ms. Norington maintaining good conduct "if she wants to achieve her transgender goals." (Id.) They also discussed the possibility of a name change as facilitating those goals. (Id.) Dr. Matias's treatment plan included helping Ms. Norington gain "a clear understanding of transition process and appropriate steps," and noted that he would investigate the possibility of Ms. Norington ordering female items from the commissary. (Id. at 16.)

Prison psychiatrist Dr. Barbara Eichman, saw Ms. Norington on September 14, 2010. (Id. at 17.) The doctor noted that Ms. Norington reported being attracted to males at a young age and "then somewhat later realized he felt he should have been born female." (Id.) The doctor noted that Ms. Norington wanted to begin treatments to change her gender. (Id.) She concluded as follows:

> Offender seems authentic in his desire to change gender. While he has had some self destructive behaviors in the past at present I see no restrictions in pursuing transgender treatments what DOC is willing to do. He would benefit from counseling to cope with the process and seems reasonably psychologically minded.

(DE 73-5 at 18.) Dr. Eichman saw no need at that point to prescribe psychotropic medication or to schedule any follow-up appointments. (Id.)

Ms. Norington saw Dr. Matias for counseling on September 15, 2010. The doctor noted that Ms. Norington "was excited about her contact with psychiatry and felt that psychiatrist was supportive of her long term goals." (Id at 19.) The doctor noted that they "explored issues involved with her HIV status and medical contraindications for sex-reassignment surgery." (Id. at 19.) Dr. Matias's treatment plan was to continue with weekly sessions, and to consult with psychiatry about the possibility of starting hormone therapy. (Id. at 20.)

On September 22, 2010, Ms. Norington put in another medical request for estrogen therapy and testosterone blockers. (Id. at 22.) Medical staff responded as follows: "Dr. Myers is in the process of consulting with the regional medical director about your request." (Id.) That same day she was seen by Dr. Matias, who reported as follows:

> Norington was seen out of cell in MSU: comes in claiming that grandmother died and is angry that he has not been allowed phone call as of yet. Was very difficult to deal with today, as he felt entitled to many things based on his transgender 'status.' He claimed that segregation is causing him harm, and asked if I could get him released. When I tried to address the fact that he assaulted three officers in one day, he blamed them for the incident, and as we spoke further, wanted to blame his victim for being murdered by him. He also did not like that I was not willing to say that his treatment for transgender issues fit under the category of medical necessity, and made vague references to trying to use power/control tactics to get me to advocate for him. His basically antisocial character revealed itself today. He alluded to feigning self harming acts such as cutting self and/or stopping to take HIV medications as a way of demonstrating the harm he is being subjected to by not getting the treatment he feels that he is entitled to.

(DE 73-5 at 24.) Dr. Matias's treatment plan was to continue working with Ms. Norington to gain a clear understanding of the gender transition process and to accept responsibility for her conduct problems. (Id. at 25.)

On September 27, 2010, Ms. Norington put in another request for estrogen therapy and "other transgender treatment modalities." (Id. at 26.) She was told that she could "review with [Dr.] Matias next time you come over." (Id.) Dr. Matias met with Ms. Norington two days later. He reported that Ms. Norington was angry and felt as if the doctor was "not going to support efforts to get hormonal treatments and ultimately sex reassignment therapy." (Id. at 27.) Dr. Matias explained to Ms. Norington that they were at the first phase of the process, and that "I would be in a better position to advise her of my opinion regarding hormonal treatments after we engaged in a period of treatment, as required by community standards." (Id.) He explained that Ms. Norington needed to take

16

counseling seriously "rather than merely as a stepping stone for what Norington ultimately wants." (Id.) He told her that her "significant conduct issues" would be a factor against getting the treatment, noting that she "continues to minimize and externalize blame for interpersonal aggression that has resulted in the current segregation time." (Id.) His notes reflect that Ms. Norington said "to ask that he be non-violent go[es] against Norington's identity as a person." (Id.) Dr. Matias also noted that he had consulted with physicians about the potential effects of hormone treatments on Ms. Norington's immune system in light of her HIV. (Id.) The doctor reviewed this information with Ms. Norington but noted that she "minimized this aspect of [the] situation." (Id. at 28.)

On October 6, 2010, custody staff escorted Ms. Norington to the medical unit for her appointment with Dr. Matias, but due to an incident, she was not seen.[8] (DE 73-6 at 3.) Dr. Matias's notes on that date reflect as follows:

> While [Ms. Norington] was waiting, he asked to go to the restroom. When the officer went to turn his cuffs around, he reportedly pulled away from the officer in an aggressive manner. He was told to stop resisting, and the encounter escalated into Norington having to be subdued and escorted out of the MSU. This is the second time that he has had an incident in the MSU since he has been getting passes for mental health. Given his behavior problems, we will discontinue sending him passes, and will see him on the unit instead, for a while.

---

[8] Ms. Norington asserts in her memorandum that this incident was "false" and that the officer was harassing her, but does not provide details about her version of events. (DE 74-1 at 6.) In any event, there is no dispute that a disturbance involving Ms. Norington occurred in the medical unit that day, the second such incident, which caused Dr. Mattias to determine that it was no longer advisable to send her passes for therapy.

(DE 73-6 at 3.) Ms. Norington was seen that day by mental health staff for behavioral segregation monitoring, and nothing unusual was noted. (DE 73-5 at 30-31.)

On October 13, 2010, Dr. Matias tried to see Ms. Norington in her cell but was unable to get on the segregation unit. (DE 73-6 at 6.) On October 16, 2010, Ms. Norington put in a medical request directed to Dr. Eichman, requesting that she schedule an appointment with her "so I may converse with you about matters of concern to me." (DE 73-6 at 5.) Dr. Matias reviewed the request and determined that an appointment with the psychiatrist was not indicated at that time. (Id.)

Dr. Matias saw Ms. Norington in her cell on October 27, 2010. (Id. at 7.) He noted that Ms. Norington had been on a hunger strike[9] and was still angry "but seemed to be trying to be more reflective and less reactive. We explained that no passes to the MSU will be sent until Norington can maintain clear conduct. We will monitor on IDU in confidential area in the mean time." (DE 73-6 at 8.) Dr. Matias's treatment goals included working with Ms. Norington to improve her ability to express anger appropriately, to assist her with "clear thinking about transgender issues," and to increase her acceptance of responsibility for her conduct. (Id.) On November 2, 2010, and November 23, 2010, Ms. Norington was

---

[9] Ms. Norington filed a separate lawsuit claiming that she received inadequate care from medical staff during the hunger strike. *See* Norington v. Draper, et al., No. 3:10cv473 (N.D. Ind. filed Nov. 9, 2010).

seen by mental health staff on the segregation unit, and no immediate problems were noted. (DE 73-6 at 9-14.)

On November 30, 2010, Dr. Matias made a notation in Ms. Norington's chart that he was discontinuing mental health services for transgender issues. (DE 73-6 at 15-16.) He stated as follows:

> After careful consideration and review of Norington's Mental Health record over the last three years, it is my determination that, at this time, Norington is inappropriate for psychotherapy focused on the treatment of Gender Identity Disorder. The first criteria for the disorder requires that the patient show a strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex).

> Norington's comments to me and other clinicians, as well as his well documented Personality Disorder, make it impossible to state with confidence that he meets criteria A for Gender Identity Disorder. Moreover, his recent history of interpersonal violence and other conduct problems (14 conduct reports in 2010, 9 of which involved interpersonal violence) make him dangerous to others and not amenable to psychological treatments other than efforts focused on curbing his violent and disruptive behavior. . . .

> For these reasons, I have removed his diagnosis of Gender Identity Disorder as his active diagnosis. I flagged it as deferred, and when he can get his interpersonal violence and otherwise disruptive behavior under control, clinicians working with him can then re-evaluate his appropriateness for psychotherapy focused on transgender issues.

> In the mean time, we will continue to monitor his mental health status every 30 days via out of cell mental health screens. These should be conducted in the private area of his current housing unit, and not at the MSU. He will receive treatment for other mental health issues as appropriate and as his clinical needs dictate. [R]eview of the last 30 day mental health screens indicate that he is coping well with segregated housing. Treatment plan has been modified to reflect this.

(DE 73-6 at 15.)

On December 3, 2010, Ms. Norington sent a medical request to Dr. Matias, stating that she had been "patient" and wanted to know whether the doctor was going to assist her in getting hormone therapy. (DE 73-6 at 18.) On December 24, 2010, Dr. Matias responded: "Sorry for the delay, but had to check some things out. Unable to provide treatment for this issue at this time." (Id.) Ms. Norington sent in several more requests for hormone therapy, but staff responded "services discontinued at this time" and "you have been deemed inappropriate for treatment of this issue at this time." (Id. at 19-23.) On December 28, 2010, Ms. Norington was seen by mental health staff for behavioral health monitoring, and no immediate problems were noted. (DE 73-6 at 23-24.)

Ms. Norington was transferred back to Westville; on December 30, 2010, and January 4, 2011, she submitted requests for estrogen therapy, sex reassignment therapy, and electrolysis. (DE 73-6 at 25-27.) She also complained that she wasn't getting her medically prescribed diet and that ISP hadn't followed up properly with medical care for an injury to her hand. (Id. at 27.) Her mental health requests were forwarded to Dr. Allen, (DE 73-7 at 3.) who met with Ms. Norington On January 6, 2011. (DE 73-7 at 4-6.) The doctor reported that Ms. Norington "was smiling" and seemed happy to see him; she told the doctor she expected to be released from prison soon based on a recent motion she had filed. (DE 73-7 at 4.) She told Dr. Allen she wanted treatment for transgender issues in the meantime. (Id.) The doctor agreed to see her for counseling and stated he would also follow-up with Dr. Rachel Ross, a prison physician. (Id.)

On January 11, 2011, Dr. Matias updated Ms. Norington's chart to include a "transfer summary." (DE 73-7 at 1-2.) He noted as follows:

> Norington came to ISP in June of 2010 demanding psychotherapy to help him in his self reported request for sex-reassignment surgery. Over the course of time and contact with him, he proved himself to be a major conduct problem, having received 7 conduct violations in 4 months, including battery, physically resisting, and destruction of property. It also became clear that his wish for self-reassignment surgery was driven more by attention seeking and secondary gain rather than distress related to his biological assignment.

(Id. at 2.)

On February 3, 2011, Dr. Allen saw Ms. Norington again, noting that she did not mention any gender issues and reported being "peaceful and content." (Id. at 7-8.) Ms. Norington told the doctor she remained hopeful she was going to be released from prison the following month. (Id.) She was seen by mental health staff a few days later for behavioral segregation monitoring and no immediate problems were noted. (Id. at 9.) On March 6, 2011, she reported to Dr. Allen and that she was "doing well." (Id.)

On March 18, 2011, Ms. Norington submitted a health care request directed to Dr. Allen, stating as follows: "For your records/information: The state has a constitutional duty to attend to prisoner's medical problems . . . . This is your notice in case you have any other plans that are contrary to treating me for transsexuality with its modalities which have been requested by me." (Id. at 12.) Dr. Allen responded that he "received and read the information above and will follow up at next scheduled BH seg visit, next scheduled visit on or before

4/4/11." (Id.) Dr. Allen met with Ms. Norington on March 31, 2011, and she stated that she had no immediate needs or concerns. (Id. at 14.) The doctor indicated that he would refer Ms. Norington to a behavioral health clinician for follow-up. (Id.)

A counselor saw Ms. Norington on April 1, 2011. (Id. at 15.) She reported having difficulties with some of the correctional officers because she didn't like when they referred to her as "Mr." or "Sir." (Id.) She was counseled on "finding a new way of getting his message across and dealing with stress," and appeared "receptive." (Id. at 16.) At an April 22, 2011 session, Ms. Norington told the counselor that she was doing well and had "decided to attempt to change the way that he approaches things and to be sure that he puts self first." (Id. at 19.) No other problems or issues were noted. (Id.) Ms. Norington was seen again on April 28 and June 20, 2011, and no immediate problems or issues were noted. (Id. at 21-25.) She was seen on July 25, 2011, and was reported to be in "good spirits." (Id. at 28.) She was seen on August 19, 2011, and no immediate needs or concerns were noted. (Id. at 29.)

On August 25, 2011, Dr. Allen received a phone call from a nurse who alerted him that Ms. Norington was "biting his arms and acting out." (Id. at 30.) Ms. Norington also had embarked on a hunger strike and had been placed in a camera cell due to "acting out behaviors, flooding cell, threatening, destroying property, and being caught with a metal object or weapon." (Id.) The doctor saw Ms. Norington that day, and she told him she had gotten angry when guards

removed some of her legal materials from her cell. (Id.) The doctor noted that she said she was "willing to eat and get back to his regular cell." (Id.) The doctor noted that Ms. Norington expressed a belief she would be getting released from prison soon and would be winning a "12 figure civil lawsuit"[10] she had recently filed. (Id.) The doctor found Ms. Norington's behavior on that date consistent with a diagnosis of Narcissistic Personality Disorder. (Id.) Ms. Norington was seen for behavioral health monitoring on September 14 and November 2, 2011, and no problems or issues were noted. (Id. at 33-34.)

III. ANALYSIS

A. Proper Defendant

Dr. Mitcheff argues that he is not a proper defendant in this case because he wasn't personally involved in providing medical care to Ms. Norington. (DE 72 at 16-17.) Although Dr. Mitcheff asserts that he was not involved in any way with Ms. Norington's treatment, evidence in the record shows otherwise.

Records show that in May 2009, Dr. Chilton informed Ms. Norington that he had "contacted CMS medical" regarding her request for estrogen therapy, and that it was unlikely to be approved. (DE 7-12 at 33.) In October 2009, in response to another request for estrogen therapy she was told, "This has been addressed with/by the Regional Medical Director many times and has been denied." (DE 73-

---

[10] Around this time Ms. Norington filed two different lawsuits complaining about the conditions of her confinement. *See* Norington v. Daniels, et al., No. 3:11cv125 (N.D. Ind. filed Mar. 24, 2011); Norington v. Obama, et al., No. 1:11cv1095 (S.D. Ind. filed Aug. 11, 2011).

3 at 1.) In April 2010 she was told by prison staff: "This request for estrogen was denied by CMS director and DOC in the past" and that the medication wouldn't be provided. (DE 73-3 at 13.) In September 2010, in response to yet another request Dr. Myers told her, "Per RMD Dr. Mitcheff's directive, evaluation per behavioral health staff is warranted to obtain additional information." (DE 73-5 at 11.) A few months later she was told, "Dr. Myers is in the process of consulting with regional medical director about your request." (DE 73-4 at 22.) Ultimately the requests were not approved, and there is no dispute that Dr. Mitcheff was Regional Medical Director of CMS during this period.[11] (*See* DE 73-2, Mitcheff Aff. ¶ 6.) Construing these documents in the light most favorable to Ms. Norington, they indicate some level of personal involvement by Dr. Mitcheff in these events.

Furthermore, Ms. Norington is also proceeding on an official capacity claim against Dr. Mitcheff related to her on-going request for hormone therapy. (DE 16.) An official capacity claim seeking injunctive relief doesn't require personal involvement; rather, the proper defendant is an official who would be responsible for ensuring that the injunctive relief is carried out. *See* Gonzalez v. Feinerman, 663 F.3d 311, 315 (7th Cir. 2011). Dr. Mitcheff doesn't dispute that as the Regional Medical Director he could ensure Ms. Norington received hormone therapy if it were ordered by the court. (*See* DE 73-2, Mitcheff Aff. ¶ 5; DE 73-3

---

[11] As Dr. Mitcheff points out, Ms. Norington appears to be under the mistaken belief that he is the Regional Medical Director for DOC, which is a different position. (*See* DE 75 at 2; DE 74 at 7-9.) Nevertheless, as indicated above several documents in the record refer to Dr. Mitcheff by name or to the CMS medical director.

at 4.) As already noted, several medical professionals sought his approval in connection with Ms. Norington's requests for hormone therapy in the past. Based on the record, summary judgment for Dr. Mitcheff is not appropriate on this ground.

## B. Deliberate Indifference

Dr. Mitcheff argues alternatively that Ms. Norington hasn't established deliberate indifference to a serious medical need.[12] (DE 72 at 17.) On this point, the court agrees. As recounted above, the record shows that over the course of several years, mental health staff at three different correctional facilities met repeatedly with Ms. Norington to evaluate her gender issues and her need for treatment. During this period, Ms. Norington was found guilty of committing multiple disciplinary offenses and was housed in long-term segregation, making contact with her more difficult. She was also involved in two disturbances in the mental health unit that resulted in her psychologist determining that she could no longer be sent passes for therapy sessions. She was transferred several times,

_____

[12] Dr. Mitcheff also argues that any claim over Ms. Norington's medical care before 2006, when he was a treating physician, would be time-barred. (DE 72 at 17-18.) To the extent Ms. Norington is complaining about events occurring at the time Dr. Mitcheff was a treating physician, the court agrees that such a claim would be untimely. *See* Behavioral Inst. of Ind., LLC v. Hobart City of Common Council, 406 F.3d 926, 929 (7th Cir. 2005).

in some instances at her request, and in others because of her conduct history.[13] The record further reflects that Ms. Norington was uncooperative at times with mental health staff; provided inconsistent information about her personal history; occasionally refused to speak or declined to discuss gender issues; and engaged in various types of disruptive behavior, including writing a false suicide note.

Despite these obstacles, Dr. Mattias devoted considerable time and attention to determining whether Ms. Norington was suffering from GID and in need of treatment. He met with Ms. Norington on multiple occasions and consulted with other medical staff about the advisability of hormone therapy in light of her HIV. His notes reflect a thoughtful approach to Ms. Norington's gender issues, as he tried to assess her medical needs and to help her with non-medical issues such as a name change and the purchase of female commissary items. Even as Dr. Mattias was working with her in the beginning stages of the process, Ms. Norington continued to make written demands to other medical staff for estrogen therapy and sex reassignment surgery. Dr. Mattias was legitimately concerned that she was not taking the counseling process seriously.

---

[13] Ms. Norington suggests that there is inadequate evidence of her disciplinary history in the record. (DE 75-1 at 2-3.) To the contrary, the record shows that she had 14 conduct reports in 2010, including 9 that involved violence, and that she was in disciplinary segregation during much of the past three years. (DE 73-4 at 29-30; DE 73-6 at 15.) Public court records also reflect that Ms. Norington has been found guilty of committing multiple disciplinary offenses since 2006, including attempted trafficking, destruction of property, flooding her cell, and battery on a guard. *See, e.g.,* Norington v. Superintendent, No. 3:12cv517 (N.D. Ind. filed Sept. 14, 2012); Norington v. Superintendent, No. 1:10cv746 (S.D. Ind. filed June 14, 2010); Norington v. Superintendent, No. 3:12cv234 (N.D. Ind. filed May 4, 2012); Norington v. Superintendent, No. 1:07-CV-1475 (S.D. Ind filed Nov. 16, 2007); Norington v. Superintendent, No. 1:06cv823 (S.D. Ind. filed May 22, 2006). Unless those disciplinary findings were overturned on appeal, vacated, or otherwise called into question—which Ms. Norington does not claim—she cannot raise any argument in this proceeding that would undermine their validity. *See* Edwards v. Balisok, 520 U.S. 641 (1997).

After meeting with Ms. Norington over the course of several months and reviewing her medical records for the previous three years, Dr. Mattias reached the conclusion that she wasn't suffering from GID and wasn't amenable to treatment for transgender issues. In his medical judgment, Ms. Norington's "wish for sex-reassignment surgery was driven more by attention seeking and secondary gain rather than distress related to his biological assignment." (DE 73-2.)

Ms. Norington clearly disagrees with Dr. Mattias's medical judgment, but she hasn't offered any contrary medical evidence to demonstrate that this judgment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Jackson v. Kotter, 541 F.3d at 697. Accordingly, she hasn't established deliberate indifference to a serious medical need. See Maggert v. Hanks, 131 F.3d at 671-672 (when inmate's psychiatrist determined that he was not suffering from GID and inmate failed to introduce contrary medical evidence, summary judgment for defendant was appropriate); see also Praylor v. Tex. Dep't of Crim. Justice, 430 F.3d 1208, 1209 (5th Cir. 2005) (per curiam) (whem inmate had been evaluated twice and denied eligibility for hormone therapy based on a reasoned medical judgment, the record did not establish deliberate indifference to a serious medical need); Long v. Nix, 86 F.3d 761, 765-766 (8th Cir. 1996) (transsexual inmate did not establish deliberate indifference where prison medical staff refused to implement his requested course of treatment based on their professional judgment).

It is abundantly clear from the record that Ms. Norington wants hormone therapy and sex reassignment surgery, and that she has been persistent in her request for this treatment over the course of several years. Her desire for this treatment, standing alone, does not mean that the United States Constitution entitles her to it. *See* Maggert v. Hanks, 131 F.3d at 671. Based on the record, the defendant is entitled to summary judgment.

For these reasons, the clerk is DIRECTED to UNSEAL the attachments to the plaintiff's original and first amended complaints (DE 1-1; DE 7-5; DE 7-6; DE 7-7; DE 7-8; DE 7-9; DE 7-10; DE 7-11; DE 7-12; DE 7-13; DE 7-14; DE 7-15; DE 7-16; DE 7-17; DE 7-18; DE 7-19). The defendant's motion for summary judgment (DE 70) is GRANTED and judgment is ENTERED in favor of the defendant.

SO ORDERED.

ENTERED: December   18  , 2012.

   /s/ Robert L. Miller, Jr.
Judge
United States District Court
